EVE H. KARASIK (State Bar No. 155356)
JOSEPH M. ROTHBERG (State Bar No. 286363)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: EHK@LNBYG.COM; JMR@LNBYG.COM

LATISHA V. THOMPSON
JAIMIE L. FITZGERALD
MORRISON COHEN LLP
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
Facsimile: (917) 522-3186
Email: Lthompson@morrisoncohen.com; Jfitzgerald@morrisoncohen.com
(*Applications for admission pro hac vice to be submitted*)

Attorneys for the Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| GOLI NUTRITION INC., | Case No.: |
| Plaintiff | **COMPLAINT FOR:** |
| v. | 1. **BREACH OF CONTRACT** |
| | 2. **BREACH OF FIDUCIARY DUTY** |
| | 3. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| SHARON HOFFMAN, | 4. **CONVERSION** |
| | 5. **FRAUD** |
| | 6. **UNJUST ENRICHMENT** |
| Defendant | |
| | **DEMAND FOR A JURY TRIAL** |

Plaintiff Goli Nutrition Inc. ("Goli"), by and through its undersigned counsel, alleges the following as and for its complaint against Defendant Sharon Hoffman ("Hoffman"):

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Plaintiff, a Canadian corporation, and Defendant, a citizen of California. The damage caused to Plaintiff exceeds $75,000.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) as Defendant resides and is domiciled in this District.

## NATURE OF THE ACTION

3. This action arises out of the misconduct of Defendant Hoffman – the founder, CEO, manager, and controlling member of Better Nutritionals, LLC ("Better Nutritionals").  Hoffman has repeatedly abused his position to use Better Nutritionals as a source of financial gain for himself to the detriment of the minority member, Goli.  Despite agreeing to engage in an equity sharing transaction with Goli and giving Goli a 25% ownership stake in Better Nutritionals (in exchange for which Hoffman personally received a valuable 3% interest in Goli), after Goli became the minority member Hoffman repeatedly oppressed Goli and continued to act as if he were the sole stakeholder of Better Nutritionals, improperly using the company to increase his personal wealth to Goli's detriment.

4. Since forming Better Nutritionals in 2015, Hoffman has only acted in his own best interest, without regard to the existence of any minority members and the duties the law places upon him.  His refusal to share in the benefits of Better Nutritionals is evidenced not only by his treatment of the current minority interest holder, Goli, but also of Hoffman's prior business partner (their relationship ended in a dispute over Hoffman draining Better Nutritionals' resources for his own gain to the exclusion of the minority interest holder).

5.     Hoffman it seems has learned nothing from the demise of his relationship with Better Nutritional's prior minority interest holder. To the contrary, Hoffman's relationship with his prior partner only emboldened him to take even more from the company without sharing with his new business partner throughout his relationship with Goli.

6.     Hoffman's acts of misconduct are plentiful and documented, including (i) issuing millions of dollars in distributions to himself, including $12.5 million dollars the year after Goli became the minority member; (ii) failing to notify Goli that distributions were being made; (iii) never making a distribution to Goli as was required under the Operating Agreement and California law while Goli made distributions to Hoffman; (iv) using Better Nutritionals' funds to pay himself and his wife, who performed no recognizable duties on behalf of Better Nutritionals, exorbitant salaries and commissions, which were really disguised distributions; (v) using Better Nutritionals' funds to purchase new lavish multi-million dollar home, as a way to funnel money to the Hoffmans and away from Goli; (vi) causing Better Nutritionals to default on its legal and contractual obligations to creditors, while leaving Goli responsible for certain of those debts; and (vii) causing Better Nutritionals to abandon a sale of the company that would have preserved value for Goli as the minority member because Hoffman's personal tax liability and bills would not have been completely paid off in the transaction.

7.     Hoffman's actions towards Better Nutritionals' minority member, Goli, are particularly shocking, given that Goli repeatedly went above and beyond to support Better Nutritionals' business.  Indeed, up until it became clear that Hoffman was breaching his obligations to Goli, and intended to operate the business as his own personal fiefdom without concern for its minority member or taking personal responsibility for his poor choices, Goli took remarkable steps to support Better Nutritionals, including putting millions of dollars of its own money at stake.

8.     To be clear, the relationship between Goli and Better Nutritionals got off to a positive start.  In early 2018, Goli, a nutrition company that markets and sells a variety of nutritional gummy supplements, was looking for a contract manufacturer to produce and supply its products. Better Nutritionals, a relatively small manufacturer of gummy vitamins, reached out to Goli, just as Goli's search was underway. While Better Nutritionals was neither the most experienced nor lowest priced manufacturer, Goli was impressed by the samples initially produced by Better Nutritionals and decided to move forward with the company.

9.     In November 2018, Goli entered into an agreement with Better Nutritionals, pursuant to which Goli placed its initial order with Better Nutritionals to manufacture and supply Goli's proprietary apple cider vinegar gummy supplements. The production was a success and Goli followed it by placing a number of additional orders.  Goli was initially happy with the quality of the products that Better Nutritionals produced and Better Nutritionals made more money in sales to Goli than it had at any point since the company's inception.

10.    Both Goli and Better Nutritionals quickly recognized that the relationship between the two companies had significant growth potential. For its part, Goli also recognized that it had an interest in maintaining a well-functioning relationship with Better Nutritionals and that any assistance it could provide to ensure Better Nutritionals' success would also help Goli succeed. Goli needed a manufacturer of product and Better Nutritionals represented that it could continue to supply Goli with high quality supplements.

11.    As the relationship between the parties progressed, Better Nutritionals informed Goli that it lacked the production capacity to  meet  Goli's demands while continuing to manufacture product for Better Nutritionals' other clients, including Hoffman's wholly-owned supplement retail company—Vitamin Friends. As such, Hoffman represented to Goli that he wanted to expand Better Nutritionals' manufacturing facilities and open a new state of the art facility.  Goli put millions of

1  dollars of its own money at stake in order to help Better Nutritionals expand to a
2  larger facility with state of the art equipment.

3      12.    Goli agreed to take on primary responsibility for a 420,000 square foot
4  facility in Norco, California that was to be occupied by Better Nutritionals, in
5  exchange for Better Nutritionals' promise to pay the deposit and monthly rent and
6  expenses and Better Nutritionals' guarantee under the lease.  Goli also agreed to be
7  responsible for the state of the art equipment Better Nutritionals wanted to outfit the
8  new manufacturing space in Norco, based on a representation from Hoffman that
9  Better Nutritionals would make all payments and guaranty all such payments.

10      13.    In a further attempt to solidify the relationship between the parties and
11 optimize synergies, Hoffman and Goli agreed to enter into an equity transaction (the
12 "Stock Swap"), pursuant to which Goli would obtain a 25% interest in Better
13 Nutritionals, and Hoffman would obtain 3% of Goli's outstanding shares.
14 Following extensive negotiations, with each party represented by sophisticated
15 counsel and financial advisors, the transaction was finalized in December of 2020.
16 Upon completion, Goli became the 25% minority stakeholder in Better Nutritionals
17 and Hoffman (rather than Better Nutritionals) individually obtained a 3% interest in
18 Goli's outstanding shares.

19      14.    Despite agreeing to the Stock Swap and acknowledging that Goli was a
20 25% minority stakeholder, from the time Goli's membership interest in Better
21 Nutritionals was finalized, Hoffman took actions that were entirely at odds with
22 both Goli's status as a minority stakeholder and the fiduciary duty he owed to Goli
23 in his capacity as manager of Better Nutritionals.  Hoffman took millions of dollars
24 in distributions for himself, and in direct violation of Better Nutritionals' Operating
25 Agreement and California law, did not share any distributions with Goli, who was
26 unaware that distributions were even being made. In contrast, Goli made
27 distributions to Hoffman when distributions were made to its other shareholders.
28 Hoffman did not stop at the distributions either.  He paid himself and his wife

exorbitant compensation and used funds taken from Better Nutritionals to purchase a lavish home and other expensive items for his personal use.  At the same time that Hoffman was taking millions of dollars out of the company for his own personal use, Hoffman caused Better Nutritionals to default on its obligations related to the new facility and equipment, leaving Goli on the hook for millions of dollars.

15.     From the outset, Hoffman took complete advantage of Goli's efforts to facilitate their relationship, taking millions in distributions and improper fringe benefits to the exclusion of Goli, while at the same time enjoying the benefits of being a Goli shareholder (including receiving shareholder dividends from Goli).

16.     In another act of disloyalty and in breach of his fiduciary duties, Hoffman caused Better Nutritionals to reject a reasonable solution to the problems caused by Hoffman's misconduct—a sale of Better Nutritionals.  Although the sale negotiated over several months would have preserved certain value for Goli, as the minority shareholder, and satisfied Better Nutritionals' creditors, including Goli, Hoffman compromised the sale because he was unsatisfied with the compensation he would personally receive as a result of the potential sale, with which he wanted to cover outstanding personal obligations.

17.     At all relevant times, Hoffman has chosen to act as if he was the sole member of Better Nutritionals.  His acts of misconduct have harmed Goli as the minority member who, despite putting its best efforts into fulfilling its obligations as a stakeholder in Better Nutritionals, is now left with no recourse but to bring this action against Hoffman to be paid the distributions it was entitled to under the Operating Agreement and California law.

## **THE PARTIES**

18.     Plaintiff Goli Nutrition Inc. is a corporation organized under the laws of Canada, with its principal place of business at 1 Westmount Square, Suite 1500, Westmount, H3Z2P9, Quebec, Canada.   Goli is the successor-in-interest to 12416913 Canada Inc. ("12416913 Canada").

19.     Defendant Sharon Hoffman is an individual citizen of California, with an address at 39933 Cresta Land Circle, Murrieta, California 92562. Hoffman is the founder of Better Nutritionals, as well as a member and its manager as set forth in Better Nutritionals' Operating Agreement.

**ALLEGATIONS OF FACT COMMON TO ALL CLAIMS FOR RELIEF**

**A.     Goli Begins Its Relationship With Better Nutritionals And Helps Better Nutritionals Expand Its Operations.**

20.     Goli is a nutrition company that owns the proprietary formulas, trademarks and patents for an innovative line of supplements and nutrition products sold under the Goli® brand. Goli sells a variety of dietary supplement gummies, including, but not limited to, its popular Goli Apple Cider Vinegar Gummies (the "ACV Gummies").

21.     Better Nutritionals, a contract manufacturer for nutritional supplements, was founded by Hoffman in 2015.  When Goli and Better Nutritionals first entered into their relationship, Hoffman represented that he was the founder and beneficial owner of Better Nutritionals.

22.     On November 28, 2018, Goli entered into a contract with Better Nutritionals pursuant to which Better Nutritionals agreed to manufacture the ACV Gummies for Goli.

23.     Initially, Goli was satisfied with the product that Better Nutritionals manufactured, and as the demand for its product increased, Goli continued to supply Better Nutritionals with orders to manufacture and supply Goli's ACV Gummies, as well as other products.

24.     In February 2020, Better Nutritionals advised Goli that it had identified a new manufacturing facility located in Norco, California (the "Norco Property") that was larger than its existing facility and would allow it to increase its manufacturing capacity.

25.     The Landlord of the Norco Property, however, would not allow Better Nutritionals to rent or occupy the Norco Property unless Goli agreed to obligate itself under the Lease.  As Goli was satisfied with the product being created by Better Nutritionals, and hopeful about building a long-term relationship with Better Nutritionals and Hoffman, Goli was willing to lease the Norco Property for Better Nutritionals' occupancy.

26.     The lease for the Norco Property was finalized in March 2020, at which time Goli was listed as the tenant on the lease, but agreed with Better Nutritionals that Better Nutritionals would occupy the space on the condition that it make the rental payments and guarantee all of Goli's obligations under the lease.

27.     In addition to occupying the Norco Property, Better Nutritionals also sought to outfit the new facility with state of the art manufacturing machinery financed by Atos IT Solutions and Services, Inc. ("Atos" and the "Atos Equipment").  Like with the Norco Property, Better Nutritionals was not in a financial position to be able to obtain the Atos Equipment on its own.  Again, Goli assisted Better Nutritionals and agreed to enter into an agreement with Atos for the Atos Equipment. Better Nutritionals was also a party to the agreement with Atos wherein it guaranteed Goli's obligations. By separate agreement Better Nutritionals expressly assumed Goli's payment obligations under the agreement with Atos and the lease for the Norco Property.

28.     The Atos Equipment included two different categories of equipment that would be used to manufacture two different product types. The first category of equipment, referred to as "Smart Line 1," would be used in manufacturing Goli's lines of product, but the second, "Smart Line 2" would be able to be used primarily to manufacture OTC products.  Goli does not sell OTC products, and never had any plans for Better Nutritionals to manufacture OTC products for Goli to sell.

29.     It was always understood between Goli and Better Nutritionals that Better Nutritionals would pay for all of the Atos Equipment, and related installation

and services. This makes sense as Better Nutritionals was operating the Atos Equipment, and importantly the Smart Line 2 equipment was capable of supporting production of products Hoffman wanted Better Nutritionals (or Hoffman's other company, Vitamin Friends) to be able to make at the Norco Property that were unrelated to Goli or its products.

30.   Despite not yet having a formal financial stake in Better Nutritionals when the lease for the Norco Property and the agreements for the Atos Equipment were entered into, Goli recognized that Better Nutritionals needed Goli's assistance in order to strengthen its manufacturing capacities, and Goli was willing to take steps, including using its own money and helping Better Nutritionals secure equipment that would not be used to manufacture its own products, to help Better Nutritionals succeed.

**B.     Goli and Hoffman Enter Into The Stock Swap.**

31.   By early 2020, it was apparent to Goli that since Goli and Better Nutritionals each had an interest in the others' continued success, it made sense to cement those interests with an equity transaction that would give Goli and Hoffman a financial stake in each other's company.

32.   On or about March 24, 2020, Hoffman, in his individual capacity, and Michael Bitensky, Goli's Co-CEO and Co-President, executed a Letter of Intent (the "LOI") that set forth the initial terms of the Stock Swap. The LOI provided that Goli would receive 25% of the outstanding units of Better Nutritionals, and Hoffman (not Better Nutritionals) would personally receive 3% of the outstanding shares of Goli.

33.   The negotiations for the Stock Swap took place over the course of nearly a year, and both Goli and Hoffman, individually, were represented by sophisticated counsel and other advisors.

34.   Hoffman was advised in the Stock Swap transaction by PricewaterhouseCoopers ("PwC"), the second-largest professional services network in the world, and one of the Big Four accounting firms.  Hoffman was represented

by DLA Piper ("DLA"), one of the most recognizable law firms globally, in connection with the Stock Swap.

35.    Goli was advised in connection with the Stock Swap by Hardy Normand & Associates ("HNA") a top Canadian accounting firm, and represented by Davies Ward Phillips & Vineberg LLP, a leading Canadian business law firm that Goli frequently uses as its counsel in corporate transactions.

36.    Throughout the fall of 2020, Goli's and Hoffman's counsel and advisors worked together closely on valuation matters and negotiated the deal points of the transaction.  Counsel engaged in months of back and forth negotiations before the transaction closed.

37.    Hoffman, through his advisors and counsel, at all times had the opportunity to review and negotiate the proposed deal terms and valuations of both Goli and Better Nutritionals, and his advisors did participate in such negotiations.

38.    On or about December 10, 2020, the Stock Swap was finalized by the execution of a series of agreements and other documents.

39.    One such agreement was the Better Nutritionals Operating Agreement (the "Operating Agreement") that included a mechanism under which rights in Better Nutritionals would be given to 12416913 Canada, the Goli affiliate that was amalgamated into Goli in October 2021.  A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

40.    Bitensky, on behalf of 12416913 Canada, executed a "Joinder Agreement" pursuant to Section 6.04 of the Operating Agreement, under which it became "admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of holder of Class A Common Units."  A true and correct copy of the Joinder Agreement is attached hereto as Exhibit B.

41.    Upon the amalgamation of 12416913 Canada into Goli, Goli succeeded to its rights and interests in Better Nutritionals.

42.    In relation to distributions, the Operating Agreement provides that:

> The Manager may, from time to time, authorize a distribution to the Members of Proceeds Available for Distribution. Distributions determined to be made by the Manager pursuant to this Section 5.01(b) shall be paid to the Members pro rata in proportion to their Units then held.

(Operating Agreement, § 5.01(b)).

43.    The Operating Agreement also names Hoffman as the Manager of the Manager-managed LLC.  (Operating Agreement, § 3.01).

44.    As Manager, Hoffman was responsible for managing the day-to-day affairs of Better Nutritionals, and was not required to keep the other members informed of business decisions. (Operating Agreement, § 3.01) ("Except as otherwise provided by RULLCA or this Agreement, the business, property, activities, and affairs of the Company shall be managed by the Manager, including, without limitation, the right to set salaries, declare bonuses and pay commissions to any manager, officer or employee of the Company, including, without limitation, Sharon Hoffman and Odelya Hoffman.").

45.    Hoffman was also the only member of Better Nutritionals with the authority or right to act on behalf of Better Nutritionals.  (Operating Agreement, § 3.01).  He also had the exclusive right to appoint individuals to serve as Officers of Better Nutritionals.  (Id., § 3.02).

46.    The Operating Agreement does not grant Goli the ability to be involved in business decisions or the management of Better Nutritionals, providing voting rights only in a limited number of situations such as electing to dissolve the company or amending the Operating Agreement (Operating Agreement, § 2.01(c)), or in relation to voting on a sale transaction in certain circumstances. (*Id.*, § 6.03).

**C.    Goli's Discovers Hoffman's Misdeeds.**

47.    After the Stock Swap, business between Goli and Better Nutritionals proceeded smoothly for a number of months, with Goli submitting non-binding purchase orders and forecasts, and Better Nutritionals continuing to produce product

to fill those orders. In the first half of 2021, Goli purchased approximately $103 million of product from Better Nutritionals.

48.     However, in the summer of 2021, Goli notified Better Nutritionals that it would be reducing its forecasts and purchasing less product than it had initially anticipated.

49.     Given that Goli and Better Nutritionals had just completed an extraordinarily successful period, with Goli purchasing millions of bottles in product from Better Nutritionals, it was Goli's understanding that both companies were on strong financial footing.

50.     Additionally, as all of Goli's purchase orders and forecasts were non-binding, it was always understood that the amount of product Goli ordered could be adjusted.

51.     Contrary to Goli's expectations, Better Nutritionals' business began to falter almost immediately after Goli reduced its orders, and Better Nutritionals stopped paying its debts and began defaulting on a number of its obligations.

52.     For example, Better Nutritionals quickly fell behind on making the required payments for the Atos Equipment.  While Better Nutritionals continued to make payments relating to Smart Line 1 through December 2021, it failed to make the required payments for Smart Line 2.

53.     While Smart Line 1 was always arranged to be paid for in monthly installments, the initial agreement for Smart Line 2 required one initial payment of $35 million due at signing in December 2020.  These terms were changed through subsequent amendments.  The first amendment increased the total payment amount to $38,666,738 and required that to be paid through a $10 million payment followed by sixteen monthly installment payments.  The second amendment again increased the total to $42 million and required the remaining $26,763,570 to be paid in nine monthly installments of $2,973,370 each.  Better Nutritionals made only one installment payment in April 2021, but failed to make any further payments.

54.     As the primary obligor for the Atos Equipment, Goli was ultimately forced to pay millions to purchase the Atos Equipment.

55.     Similarly, after July 2022, Better Nutritionals stopped making payments for the use of the Norco Property, but has continued to occupy the space. Goli attempted to work with Better Nutritionals to reach an agreement with the Landlord regarding payment, but Better Nutritionals still failed to meet its obligations.

56.     Since September 2022, Goli has paid the rent and millions of dollars in other obligations under the lease for the Norco Property. Among other things, Goli has been required to satisfy outstanding mechanics liens placed on the Norco property arising out of Hoffman's misconduct.

57.     Goli was understandably concerned with how quickly Better Nutritionals seemed to be deteriorating, and sought to understand why, as well as to continue to find potential solutions.

58.     One such solution was a potential sale of Better Nutritionals. Over the course of several months Hoffman and Goli discussed potentially selling the company or their respective interests in Better Nutritionals.

59.     During these discussions Hoffman caused Better Nutritionals to hire an investment advisor—William Hood and Company ("William Hood")—to explore a potential sale. Ultimately, William Hood located a buyer who was willing to purchase Better Nutritional in a transaction (the "Sale Opportunity"), that upon information and belief, would have satisfied the debt owed to Better Nutritionals' creditors and would have maximized member value.

60.     Ultimately, Hoffman turned down an offer to sell Better Nutritionals, because he was unhappy with the amount of compensation he would receive personally as a result of the transaction.  Hoffman repeatedly stated that he would not approve the transaction unless he personally received sufficient compensation to satisfy his pre-existing tax liabilities and credit card debt.

61.     But before Hoffman killed the Sale Opportunity, during the related diligence process, Goli uncovered that since at least 2019, Hoffman had been taking millions of dollars out of the company for his own personal use.

62.     Most egregiously, Goli learned that Hoffman had issued himself over $12.5 million in distributions in the year after Goli became a member in Better Nutritionals, and completely hid the fact that any distributions were made from Goli, who was entitled to 25% of any distributions.

63.     Hoffman was also draining money from Better Nutritionals in the form of excessive compensation to himself and his wife.  Just under $11 million was paid in executive compensation in 2021.

64.     Not only did Goli learn that Hoffman was paying himself and his wife excessive compensation, but Hoffman was also paying both himself and his wife additional distributions disguised as "commissions" based on the amount of all gross revenue of the company.  For example, Hoffman was paying himself 5% of all gross revenue, without regard to actual profit margin.

65.     Hoffman was also using Better Nutritionals' resources to support a lavish lifestyle, purchasing himself and his wife luxury cars and a lavish personal home, and buying extravagant box seat season tickets to sporting events.

66.     In response to Hoffman's improper distributions and other acts of misconduct and Hoffman's intent to reject a sale of Better Nutritionals at the expense of minority shareholders and creditors, counsel for Goli sent Hoffman's counsel a letter in December 2022 urging Hoffman to agree to the sale of his interests in Better Nutritionals in fulfillment of its fiduciary duties to Goli and Better Nutritionals' other creditors.  This letter put Hoffman on notice that failure to accept a proposal that would satisfy the creditors or to hold out for a proposal that would give additional value to Hoffman personally at the expense of Goli and the creditors would give rise to claims against Hoffman for breach of his fiduciary duties. Hoffman nonetheless refused to proceed with the sale.

67.    At the same time that Hoffman was taking large distributions for himself from Better Nutritionals, and excluding Goli, Hoffman's rights as a minority shareholder of Goli were being honored.  In January 2021, Goli issued Hoffman received a dividend of $345,622 (subject to a 15% withholding per Canadian tax law) in connection with his 3% ownership interest in Goli.

68.    Goli was surprised to learn of Hoffman's extreme misconduct and the massive amount of money he had been draining from the company.  Goli took its status as a member of Better Nutritionals seriously, trusted its managing member, and put a lot of effort and money into helping Better Nutritionals succeed, all the while paying Hoffman the dividends he was entitled to by virtue of the Stock Swap.

69.    Since it became a member in Better Nutritionals, Goli worked tirelessly to facilitate the relationship, including by paying millions of dollars of its own money to satisfy obligations that Better Nutritionals was responsible for and were critical to operating the business.

70.    While Goli was satisfying its obligations, Hoffman acted in clear violation of the Operating Agreement, and California Law, and throughout 2021, issued himself millions of dollars in distributions to the exclusion of Goli.  Goli was not aware of these distributions, and did not receive any.

71.    Despite the clear language in the Operating Agreement that any distributions are to be made pro rata in accordance with the ownership of the outstanding shares, and Goli owning 25% of Better Nutritionals' outstanding shares, while Hoffman was giving distributions to himself, Goli has never received a distribution in any amount from Better Nutritionals.

72.    Eventually, as he declined to sell Better Nutritionals and had drained the company of most of its resources, Hoffman caused Better Nutritionals to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 20, 2022.

73.   On March 21, 2023, Hoffman caused Better Nutritionals to file a motion to convert the chapter 11 case to a chapter 7 liquidation.

**D.   Hoffman's Treatment of Goli is Consistent with How He Treated the Prior Minority Stakeholder.**

74.   While Goli was shocked to discover Hoffman's improper distributions and other misconduct through which he had taken upwards of $20 million out of Better Nutritionals, Hoffman's actions towards Goli are apparently consistent with how he has always treated minority members.

75.   In 2016, Hoffman and his original partner in Better Nutritionals, Per Mirazov Jensen ("Jensen"), executed an operating agreement (the "2016 Operating Agreement"), pursuant to which Jensen owned a 22% interest in Better Nutritionals.

76.   In late 2019, Jensen sought to examine Better Nutritionals financials pursuant to his rights under the 2016 Operating Agreement to determine whether Hoffman was paying any personal expenses out of Better Nutritionals such that it was impacting the company's EBITDA.

77.   Hoffman denied Jensen's requests for information, and attempted to improperly repurchase Jensen's shares, without Jensen's consent and in violation of the 2016 Operating Agreement.

78.   Eventually, the dispute was resolved when on or about June 17, 2020, Hoffman and Jensen executed a settlement agreement (the "Settlement Agreement") pursuant to which they formally terminated their business relationship, with Hoffman repurchasing Jensen's shares in Better Nutritionals.

79.   Pursuant to the Settlement Agreement, Hoffman agreed to repurchase Jensen's shares in Better Nutritionals for the sum of $6 million, to be paid in an initial payment of $2 million followed by four installment payments of $1 million at the 3, 6, 9 and 12 month anniversaries of the Settlement Agreement.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Breach of the Operating Agreement Against Hoffman)

80.    Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

81.    Goli's affiliate, 12416913 Canada, entered into the Operating Agreement with Hoffman in December 2020.  In October 2021, 12416913 Canada was amalgamated into Goli, who now holds the interest in Better Nutritionals.

82.    The Operating Agreement is a valid and binding contract between Goli and Hoffman.

83.    Goli has performed all obligations it was required to under the Operating Agreement.

84.    The Operating Agreement provides that if any distributions are made from Better Nutritionals' assets, such a distribution is to be made to each Member in accordance with their shares. (Operating Agreement § 5.01(b)).

85.    As described above, Hoffman gave himself a minimum of $12,565,895.43 in distributions from Better Nutritionals after Goli became the minority member.

86.    As described above, Hoffman has materially breached the Operating Agreement by failing to pay Goli 25% of the amount of any distributions made, in contravention of Section 5.01(b) of the Operating Agreement.

87.    Hoffman is liable to Goli in an amount to be determined at trial, but no less than $3,141,473.85 million.

### SECOND CLAIM FOR RELIEF

#### (Breach of Fiduciary Duty Against Hoffman)

88.    Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

89.    As Manager of Better Nutritionals, as well as the controlling member and CEO, Hoffman owed the minority members fiduciary duties, including to manage the company in a way that would benefit all members.

90.    The only member Hoffman sought to benefit was himself.

91.    As alleged above, Hoffman breached his fiduciary duties by, among other things, (i) issuing distributions to himself, but not to Goli, who was also a member, despite the provision in the Operating Agreement requiring that any distribution be made to all members, (ii) failing to notify Goli that distributions had been made, (iii) instead of using Better Nutritionals resources to pay the company's outstanding obligations, which he knew Goli, its minority member, would remain liable for, using Better Nutritionals' resources for personal gain, including to purchase a lavish personal home and other luxuries and to pay exorbitant compensation  to himself and his wife; and (iv) causing Better Nutritionals to abandon a sale of the company that would have preserved value for Goli as the minority member because Hoffman's personal tax liability and bills would not have been completely paid off in the transaction.

92.    Hoffman's breaches of its fiduciary duty have proximately caused damages to Goli in an amount to be proven at trial, but not less than $30,000,000.

## THIRD CLAIM FOR RELIEF

(Breach of the Implied Covenant of Good Faith and Fair Dealing against Hoffman)

93.    Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

94.    As alleged above, Hoffman and Goli entered into the Operating Agreement, which is a valid and binding contract.

95.    The duty of good faith and fair dealing is implied in every contract and imposes upon each party to the contract a duty to act in good faith and engage in fair dealing in the performance of the contract and the enforcement of the contract.

96. Hoffman seriously injured Goli's rights under the Operating Agreement by taking distributions for himself and not paying any distributions to Goli in accordance with its ownership of 25% of the shares of Better Nutritionals.

97. Hoffman's misconduct has proximately caused damages to Goli in an amount to be proven at trial, but not less than $3,141,473.85.

## FOURTH CLAIM FOR RELIEF

### (Conversion Against Hoffman)

98. Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

99. Throughout 2021, Hoffman issued himself a minimum of $12.5 million in distributions from Better Nutritionals, and did not make any distributions to Goli despite it owning 25% of the outstanding shares.

100. Pursuant to the Operating Agreement, Goli was entitled to a pro rata share of any distributions made from Better Nutritionals.

101. Hoffman improperly, wrongfully, and illicitly and in violation of his obligations to Goli as minority member, usurped, converted, and misappropriated for his own benefit, the entirety of the $12,565,895.43 million worth of distributions, including the 25% that should have been distributed to Goli.

102. Due to Hoffman's improper and wrongful conduct, Goli has been damaged in an amount to be proven at trial, but not less than $3,141,473.85.

## FIFTH CLAIM FOR RELIEF

### (Fraud Against Hoffman)

103. Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

104. Throughout the time that Goli was the minority member of Better Nutritionals, Hoffman intentionally misrepresented and/or concealed the financial condition of Better Nutritionals from Goli, so that he could continue to engage in misconduct, including (i) issuing millions of dollars of distributions to himself and

not to Goli, (ii) paying himself and his wife exorbitant compensation while allowing Better Nutritionals to default on its obligations, and (iii) extracting millions of dollars from Better Nutritionals to pay the former minority member.

105.   Goli did not specifically know that Hoffman was abusing his authority and relied on his representations and any limited financial information that was provided to Goli.

106.   Hoffman intended to deceive Goli by misrepresenting and/or concealing the distributions and other aspects of Better Nutritionals' true financial condition so that he could continue to engage in his misconduct to the detriment of Goli and its interest in Better Nutritionals.

107.   In manager-managed LLCs, the manager has a duty to disclose all matters substantially affecting the value of the LLC.

108.   As Manager, Hoffman had a duty to disclose this information to Goli, a member in the company.

109.   Goli reasonably relied on Hoffman's deceptive conduct when, among other things, it continued to assist Better Nutritionals in covering the costs for the Norco Property and Atos Equipment.

110.   As a direct and proximate result of Hoffman's misconduct described above, Goli has suffered and continues to suffer substantial damages.

111.   Goli is informed and believes that the aforementioned acts of Hoffman were willful, oppressive, fraudulent, and/or malicious, and as such Goli is entitled to punitive and exemplary damages.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Hoffman)

112.   Goli repeats and re-alleges each and every paragraph set forth above as if fully set forth herein.

113.    As a result of Hoffman's improper conduct described above Hoffman has improperly, wrongly and unlawfully received, retained and derived benefits at the expense of Goli.

114.    Hoffman received distributions in excess of his share, the balance of which should have been distributed to Goli.

115.    Hoffman also paid excessive executive compensation to himself and his wife, including "commissions" based off the company's gross revenue.    The compensation and commissions were a way for Hoffman to disguise additional distributions.

116.    If Hoffman is allowed to keep his improperly and wrongly derived benefits, he will be unjustly enriched. Therefore, Hoffman should be ordered to make restitution of all monies that belong to Goli, plus interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Goli prays for judgment against Defendants as follows:

a)    As to the First, Third, and Fourth Claims for Relief, for damages in an amount to be determined at trial, but no less than $3,141,473.85;

b)    As to the Second Claim for Relief, for damages in an amount to be determined at trial, but no less than $30,000,000;

c)    As to the Fifth Claim for Relief, for damages in an amount to be determined at trial, plus punitive and exemplary damages;

d)    As to the Sixth Claim for Relief, for damages in an amount to be determined at trial representing all monies that are determined to belong to Goli;

e)    And As to All Claims for Relief, (i) for pre- and post-judgment interest as allowed by law; (ii) for costs and expenses, including attorneys' fees to the extent they are available, and (iii) for such other and further relief which may be deemed just and proper.

1

## <u>DEMAND FOR TRIAL BY JURY</u>

2   PLAINTIFF HEREBY DEMANDS A JURY TRIAL PURSUANT TO LOCAL RULE 38-1.

3   DATED: March 23, 2023              Respectfully submitted,

4

5                                      _Eve V. Karasik_ _____

6                                      EVE H. KARASIK (State Bar No. 155356)
7                                      JOSEPH M. ROTHBERG (State Bar No. 286363)
                                       LEVENE,    NEALE,    BENDER,    YOO    &
8                                      GOLUBCHIK L.L.P.
                                       2818 La Cienega Avenue
9                                      Los Angeles, CA 90034
                                       Telephone: (310) 229-1234
10                                     Facsimile: (310) 229-1244
                                       Email:EHK@LNBYG.COM; JMR@LNBYG.COM
11

12                                     LATISHA V. THOMPSON
                                       JAIMIE L. FITZGERALD
13                                     MORRISON COHEN LLP
                                       909 Third Avenue, 27th Floor
14                                     New York, New York 10022
                                       Telephone: (212) 735-8600
15                                     Facsimile: (917) 522-3186
                                       Email:Lthompson@morrisoncohen.com;
16                                     Jfitzgerald@morrisoncohen.com
                                       (*Application for admission pro hac vice submitted*)
17

18

19                                     *Attorneys for the Plaintiff Goli Nutrition Inc.*

20

21

22

23

24

25

26

27

28